# NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K2 INSURANCE SERVICES, LLC, et al.,<br><br>                           Plaintiffs,<br><br>v.<br><br>David KING, et al.,<br><br>                        Defendants. | Case No.: 3:22-cv-00862-AGS-KSC<br><br>**ORDER GRANTING:**<br>  **(1) CRS'S AND CIM'S SUMMARY-JUDGMENT MOTION (ECF 51)**<br>**AND PARTIALLY GRANTING:**<br>  **(2) KING'S SUMMARY-JUDGMENT MOTION (ECF 59),**<br>  **(3) LEFEBVRE'S AND DCN'S SUMMARY-JUDGMENT MOTION (ECF 52), AND**<br>  **(4) PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY (ECF 55)** |

This case involves a corporate acquisition gone awry. The purchaser claims it was misled into overpaying. The defendant sellers insist everything was aboveboard and move for summary judgment.

## **BACKGROUND**

Defendants David King and Robert Lefebvre "have been friends and business associates since the late 1980s." (ECF 80-1, at 10.) In 1995, King established High Point Underwriters, LLC (High Point), a wholly owned subsidiary of another King entity: High Point Holdings, LLC (High Point's Parent Company). (ECF 52-13, at 4; ECF 80-1, at 11.) High Point "was and is in the business of procuring and underwriting occupational accident and contingent liability insurance." (ECF 52-1, at 10; ECF 80-1, at 11.)

Lefebvre owned a minority interest in High Point's Parent Company through two other business entities he controlled, defendants Contractor Resource Solutions, Inc. (CRS), and Creative Insurance Managers, Inc. (CIM). (ECF 52-3, at 6.) Lefebvre himself is "in the business of providing third-party administrative services to independent owner-

operators" and "motor carriers in the transportation industry." (ECF 52-3, at 2.) He assists them with payments, tax reporting, and the selection and maintenance of "legally mandated insurance coverage" through third-party brokers and underwriters. (*Id.* at 2.) In 2010, Lefebvre founded defendant Trucking Support Services, LLC (TSS), which performs these duties "as an outside third-party administrator." (*Id.* at 3.) TSS's "clients" are "primarily motor carriers and courier services." (ECF 79-4, at 2.) Lefebvre wholly owns and controls TSS. (ECF 52-3, at 3.)

In 2014, defendant Distribution Cooperative Network of New York, Inc. (DCN) was formed. (*Id.* at 4.) Lefebvre's precise involvement with DCN's founding is unclear. DCN is a "cooperative corporation" that provides services comparable to TSS's, but its clients "purchase shares of DCN and become part owners" instead of engaging it as a third-party administrator. (*Id.* at 3–4.) Lefebvre has "no ownership in DCN," is not one of its officers, and was not on its board of directors before June 2021. (*Id.* at 4.) On March 5, 2015, TSS and DCN signed an agreement that "essentially made TSS the manager of DCN." (*Id.* at 4; *see* ECF 52-5, at 1–3 (Administrative Services Agreement).)

Starting around 2015 and proceeding "gradually over the course of several years," TSS lost almost all its clients, many of which migrated to DCN. (ECF 52-3, at 3.) And "beginning in 2015, any new owner-operators joined as DCN shareholders, not as TSS clients." (*Id.* at 3.) As of September 2023, TSS had "only two clients remaining." (*Id.* at 3.) TSS, as DCN's manager, continued to acquire insurance products through High Point for DCN's shareholders, even as its own client list dwindled. (*See* ECF 79-5, at 7, 10–11; ECF 52-14, at 2.)

On June 1, 2015, TSS signed an Exclusive Agency Agreement (EAA) with High Point, under which High Point was to act as TSS's "exclusive agent" for procuring insurance products "necessary or advisable for the operation of TSS's business." (ECF 1-6, at 2. *See generally* ECF 1-6 (EAA).) Lefebvre knew that High Point's Parent Company "was in the process of being acquired by" plaintiff K2 Insurance Services, LLC. (ECF 79-2, at 36.) King told Lefebvre that "it was K2's idea to have an exclusive agency agreement"

2

between High Point and TSS—"that it would be required [for] K2 to complete the purchase agreement." (*Id.* at 37, 39.) The "only reason" Lefebvre signed the EAA "was to facilitate the purchase of High Point by K2." (*Id.* at 42.) Neither Lefebvre nor King considered the EAA to apply to DCN. (ECF 52-13, at 8–9; ECF 52-3, at 7.) Nor do plaintiffs contend that DCN was bound by the EAA's terms. (*See* ECF 52-11, at 8.)

In January 2016, plaintiff K2 acquired a majority membership interest in High Point's Parent Company. (ECF 52-1, at 11; *see* ECF 1, at 6; ECF 1-4.) After the purchase, High Point's Parent Company was owned 60% by K2 and about 30% by King, with the remainder held by Lefebvre (through CRS and CIM) and another investor. (ECF 1, at 6; *see* ECF 1-4, at 64.) At the same time, a new operating agreement for High Point's Parent Company was signed (the 2016 LLC Agreement). (ECF 1, at 6.) King became a member of its board of managers and its "Chief Executive Officer and President." (ECF 79-2, at 76–77; *see* ECF 1-4, at 30, 32.)

The "2016 LLC Agreement gave King the express option, exercisable after a specified period, to require" K2 to purchase all High Point's Parent Company membership units held by King and Lefebvre's holding companies CRS and CIM. (ECF 1, at 7; *see* ECF 1-4, at 51–52.) The purchase price was to be calculated based on "the trailing twelve months pre-tax income of [High Point] as determined in accordance with GAAP [generally accepted accounting principles]." (*See* ECF 1-4, at 10.) Those principles do "not allow for the exclusion of non-recurring income." (ECF 80-1, at 27; *see* ECF 52-20, at 8–10.)

Marc Risen is president of Midwestern Insurance Alliance, a wholly owned subsidiary of K2, which eventually subsumed High Point's operations in 2021. (*See* ECF 79-5, at 1, 2). Between January 2016 and December 2020, Risen "had frequent business interactions" with King. (*Id.* at 2.) On February 26, 2016, King sent Risen an email mentioning DCN and describing it as "a new entity Bob [Lefebvre] set up earlier this year." (ECF 52-14, at 2.) King continued: "We expect DCN to become very active and ultimately supplant TSS (although TSS will continue to do the actual processing for DCN)." (*Id.* at 2.) In his communications with Risen between 2016 and 2020, King "consistently

3

referred to DCN as being part of the 'TSS Program.'" (ECF 79-5, at 3; *see* ECF 79-5, at 7.) For instance, on March 27, 2020, King sent a report to Risen that, in his words, "pretty much tells the whole TSS story." (ECF 79-5, at 7.) After saying that "in 2017 TSS began a concerted effort to move all of their clients into the DCN Coop program," he reported that in 2019, "TSS added 15 new clients." (*Id.*)

On April 30, 2020, King notified K2 of his election to exercise his option to sell his and Lefebvre's remaining interest, suggesting that High Point should be valued based on its income for the 12 months leading up to "3/31/20." (ECF 59-16, at 2–3.) Thereafter, King and K2 engaged in negotiations concerning the company's valuation; Lefebvre "had only minimal participation" in these talks. (ECF 52-3, at 7; *see* ECF 80-1, at 28.) Around this time, Risen hired Patrick Murray to eventually succeed King as High Point's president. (ECF 85, at 2.)

On June 18, 2020, K2's CEO Kimmel emailed King: "I believe we have an agreeable succession plan and can accept your requested date of March 31, 2020." (ECF 59-15, at 4; *see* ECF 79-2, at 58–59.) At the time, Kimmel "had no knowledge," but "assumed Bob Lefebvre's business, under whatever name he called it, was exclusive for a long period." (ECF 79-2, at 61.)

On June 29, 2020, Lefebvre emailed King: "Please accept this email as my notice to Highpoint of our decision not to renew our Exclusive Agency Agreement expiring June 2020. I would prefer to continue our relationship in the future on a year-to-year bas[i]s." (ECF 1-7, at 2; ECF 59-2, at 46.) Lefebvre admits that, by sending this email, it was his "intention to terminate" the EAA because he "didn't want to renew" it. (ECF 79-2, at 43.) King replied to this email within minutes, acknowledging and agreeing to Lefebvre's termination request. (*See* ECF 59-13, at 11–12.) Later, however, King called Lefebvre and rescinded his earlier agreement, saying he had "jumped the gun"; Lefebvre's attempted termination was untimely because the EAA required notice of "intention to terminate . . . no later than 90 days from the expiration of the then-current term." (*See* ECF 59-13, at 12–13; ECF 1-6, at 3.) King says he placed that rescinding call to Lefebvre "minutes

4

later," "the very same day." (ECF 59-9, at 13.) Lefebvre, on the other hand, says it came "several months later." (ECF 52-3, at 8.) In any event, Lefebvre accepted King's refusal, finding it "no big deal." (ECF 59-13, at 13–14; *see* ECF 52-3, at 8.) Because Lefebvre did not provide timely notice, no one disputes that the EAA automatically renewed at the end of its initial five-year term for an additional two years. (ECF 79-2, at 103–04.) King "never informed any member, officer, or employee of K2" that Lefebvre sent this email attempting to terminate the EAA. (ECF 79-2, at 79; *see* ECF 59-9, at 15–16.)

On September 24, 2020, K2 entered into a Repurchase Agreement with King, CRS, and CIM to purchase their collective share of High Point's Parent Company. (ECF 1, at 7–8; ECF 79-2, at 76.) The 2020 Repurchase Agreement prohibited King from "assist[ing]" or "aid[ing]" any competitor of High Point, or taking any action "intended to take away" its insurance business. (*See* ECF 1-5, at 6.) Shortly thereafter, King received several emails from Lefebvre reporting that Lefebvre had contacted a High Point competitor, Gallagher, "as [King] suggested" and "thank[ing him] for the lead." (ECF 85, at 7.)

Lefebvre soon notified High Point that he had "authorized Arthur J. Gallagher Risk Management Services, Inc. to have access to and review all of the insurance data . . . on each of our programs." (ECF 1-9, at 2.) Before King left High Point on December 31, 2020 (ECF 59-9, at 12), he did not alert Murray or Risen that the EAA existed (*see* ECF 85, at 5; ECF 79-5, at 4). After a series of competing bids, DCN's board "decided to place its insurance business with Gallagher." (ECF 52-3, at 9; *see* ECF 52-8, at 1.) In March 2021, Murray and Risen "learned that Gallagher had 'won' the bid and would be replacing High Point as the underwriter for the entire TSS/DCN book of business." (ECF 79, at 18.)

Plaintiffs later sued King, Lefebvre, DCN, TSS, CIM, and CRS, seeking the amount K2 allegedly overpaid for High Point's Parent Company and the profits High Point lost when TSS allegedly breached the EAA by moving its business to Gallagher. All defendants move for at least partial summary judgment, while plaintiffs seek to exclude certain expert testimony.

5

# DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the facts and draw all reasonable inferences "in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).

## KING'S SUMMARY-JUDGMENT MOTION

For summary judgment, King's fiduciary duties to High Point's Parent Company are evaluated under Delaware law. High Point's Parent Company is a Delaware limited liability company whose operating agreement is governed by Delaware law. (*See* ECF 1, at 21; ECF 1-4, at 55.)

## A.    Claim 4: Breach of Fiduciary Duty

In Delaware, breach of fiduciary duty has two elements: "(i) the existence of a fiduciary duty that the defendant owes to the plaintiff and (ii) a breach of that duty." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 840–41 (Del. Ch. 2022). In his summary-judgment motion, King challenges only "the second prong: breach." (ECF 59-1, at 11.)

No one disputes that, as High Point's Parent Company's "Chief Executive Officer and President" and a member of its board of managers (ECF 1-4, at 30, 32), King owed High Point's Parent Company—and its holding company K2—"traditional duties of loyalty and care," *see Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 843 (Del. Ch. 2012). Among other things, board members must "disclose all material information relevant to corporate decisions from which they may derive a personal benefit." *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989). More generally, an "agent owes the principal a duty to provide information to the principal that the agent knows or has reason to know the principal would wish to have." *Metro Storage*, 275 A.3d at 850–51.

6

Plaintiffs allege King breached these fiduciary duties by not "immediately" disclosing to K2 Lefebvre's "June 20, 2020 notice of termination" of the Exclusive Agency Agreement, which resulted in K2 "paying a grossly inflated price." (ECF 1, at 21.) King understood that the viability of both the EAA and the business relationship with Lefebvre were of material importance to K2. By early 2020, Lefebvre's business comprised "approximately 40% of High Point's revenue." (ECF 80-1, at 29.) Also, according to Lefebvre, King said that having "an exclusive agency agreement" between High Point and TSS "would be required" for "K2 to complete the [2016] purchase agreement." (ECF 79-2, at 37, 39.)

Nonetheless, King argues that no disclosure was required for various reasons, discussed below.

### 1. *Untimely Termination Notice*

King maintains that "Lefebvre agreed the EAA would continue" after King told him that his "attempt to terminate" it "did not comply with the 90-day" notice requirement. (ECF 59-1, at 10.) "Thus, King had no reason to provide K2 an update on an issue that he had resolved." (*Id.* at 11.)

But King's alleged breach goes deeper than the question of whether the EAA survived after these communications. These discussions raised the specter of losing a major client. King had previously made K2 aware that "High Point's largest client was Robert Lefebvre." (ECF 76-5, at 2.) Even if Lefebvre's attempt at termination was ineffective, his attempt to terminate the agreement would have been material to K2—that is, it was material information that King had "reason to know [K2] would wish to have." *See Metro Storage*, 275 A.3d at 850–51. On the other hand, King contends that Lefebvre did not truly want to end TSS's relationship with High Point; "he just wanted an annual agreement as he did not know the new people." (ECF 59-1, at 10.) If true, these facts still suggest that Lefebvre's commitment to High Point was waning. Surely, K2 would have wanted to know that such an important client was less comfortable with High Point's "new people" and now wanted to reduce the length of his contractual commitment to High Point. A reasonable juror could

find that King's choice not to disclose Lefebvre's attempted termination of the EAA—which came in the thick of finalizing the terms of K2's buyout of King's interest in High Point—was a deliberate breach of loyalty, motivated by self-interest in maximizing his payout.

Additionally, a material factual dispute remains about how long King himself went on believing that Lefebvre had successfully terminated the EAA—without informing K2 of that belief. After receiving the termination notice, King at first agreed with Lefebvre. (*See* ECF 59-13, at 11–12.) Some time passed in which King believed the EAA had been terminated, but during which he did not disclose that understanding to K2. King says that period was measured in "minutes" (ECF 59-9, at 13); Lefebvre says "months" (ECF 52-3, at 8). If Lefebvre is right, then King may have believed the EAA terminated *during* K2's purchase without mentioning this to K2. The length of time King kept this belief to himself—before realizing his mistake and rescinding his earlier acceptance—will influence the factfinder's conclusions about King's motivations and intent.

### 2. *Irrelevance to Purchase Price*

King next argues the attempted EAA termination could not have caused any damages. That is, even if the termination attempt had been effective and TSS had walked away from the EAA, it would not have changed the amount K2 was obliged to pay for King's and Lefebvre's interests in High Point's Parent Company. (*See* ECF 59-1, at 12–13, 16.) But damages "are not an element of a claim for fiduciary breach under Delaware law." *Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, No. CV 2018-0059-JRS, 2021 WL 3184591, at *18 (Del. Ch. July 28, 2021). Rather, once proven, "the court may fashion a remedy to address" the breach, "including by an award of nominal damages." *Id.* And a "proven breach of duty operates as a solvent to 'loosen [the] normally stringent requirements of causation and damages.'" *Metro Storage*, 275 A.3d at 859.

Moreover, even if King is right and the purchase price was immutable, K2 argues that it was damaged in other ways by being kept in the dark. During negotiations between King and K2 over the valuation of High Point, King himself requested a deviation from the

8

provisions in the 2016 LLC Agreement for calculating the "Company Equity Value"—and thus the purchase price. (ECF 79-4, at 4.) Had King disclosed that Lefebvre tried to terminate the EAA, "K2 would not have agreed to the concessions on the purchase price that totaled more than $660,000." (*Id.* at 5.) What's more, plaintiffs emphasize that King's own insistence on deviating from the contractual valuation terms when it suited him—and K2's acquiescence to that departure—establishes a "course of dealing" that proves the parties "did not consider themselves to be automatically and irrevocably tied to" the contractual formulation. (ECF 80, at 17; *see* ECF 52-20, at 12–14.) Thus, whether K2 was (or was not) damaged in the manner King argues is not dispositive for summary-judgment purposes.

### 3.  *Impossibility and Impracticability*

King contends that the EAA "was no longer applicable by reason of impossibility and impracticability" and "lay dormant from at least 2016." (ECF 59-1, at 21–22.) This argument is premised on King's—very much disputed—position that the EAA's sole purpose was for High Point to procure insurance policies for TSS as the global insured. That object was frustrated, King says, after "K2 acquired a controlling share of High Point" and "imposed QBE as its new insurance carrier." (*Id.* at 19–20.) QBE "would not permit the naming of TSS as the global insured for the over 150 truckers and trucking companies," so "henceforth" each of these individual clients "would be directly named as the insured." (*Id.* at 18.) As a result, from mid-2016 to the present, "no insurance for occupational accident or contingent liability was brokered by [High Point] for TSS" (*id.*), nor for "TSS dba CRS" or the like (ECF 94, at 9).

King maintains that this change vitiated the EAA. But he does not point to any language in that contract restricting the contemplated services solely to policies naming TSS as a "global insured." (*See generally* ECF 1-6.) The EAA instead discusses High Point's "brokering and procuring . . . Occupational Accident and Workers' Compensation insurance products and services necessary or advisable *for the operation of TSS's business*"—not just policies "for TSS" itself. (*Id.* at 2 (emphasis added); ECF 94, at 9.)

King points to no language in the EAA requiring TSS to be named (in *any* capacity, not just as the "global insured") on the policies that were "necessary for" its business. (ECF 1-6, at 2.)

For their part, plaintiffs aver that the prior insurance carrier "*never* issued . . . policies to TSS as the 'global insured,'" and this "practice did not change when QBE became the insurer." (ECF 79, at 22 (emphasis added); *see also* ECF 85, at 3.) King has not placed into evidence any *pre*-2016 policy that names TSS as "global insured," as King claims was the usual practice. Certainly, King's own reports to K2 indicate that High Point continued to broker policies "for TSS" (ECF 59-1, at 18; *see, e.g.*, ECF 79-5, at 10 (noting, in King's "TSS 3 Year Review," "$4.5mm of collected premium at 4/31/19" on "23 new accounts").)

K2 also denies that King ever suggested that the EAA's sole object was "for High Point to procure insurance policies and coverage for TSS itself as an entity." (ECF 79-4, at 3.) Had he done so, K2 says it "would never have entered into the transaction to acquire a majority interest in High Point . . . because the EAA would have no real economic value if it was so limited." (*Id.*)

The record does not support summary judgment on a theory that the EAA was functionally moot.

### 4. *King's Warning That He Couldn't "Guarantee" an EAA Extension*

Finally, King points out that—after Lefebvre's attempt to terminate the EAA and before King was paid for his remaining membership units—King implicitly warned K2 that the EAA might be at risk and he couldn't "guarantee an extension" of it. (ECF 59-1, at 21.) Specifically, on August 11, 2020, King informed K2 that he would work "to reach an agreement with TSS to continue the business relationship with [High Point]," but could "make no commitment as to the outcome of those discussions." (ECF 1-8, at 3.)

This statement is in no way a substitute for notice that TSS had *already* attempted to terminate the EAA. In fact, a reasonable jury might even interpret it as an affirmative deception, depending on whether King then believed that Lefebvre's termination had succeeded. There remains a genuine dispute of material fact about when King realized the

10

termination was legally ineffective—mere "minutes" versus "several months." King's supposedly exculpatory letter to K2 was sent 43 days after Lefebvre's June 29, 2020 email seeking to terminate the EAA. (*See* ECF 1-7, at 2; ECF 1-8, at 2–3.) A reasonable jury could find that, on the day he wrote those words, King believed the EAA had been terminated. This would completely change the statement's complexion.

In sum, whether King breached his fiduciary duty of loyalty to High Point's Parent Company and his fellow member K2 bears on questions of disputed fact. King maintains he had no duty to notify K2 that Lefebvre's business relationship was at risk. K2 asserts that King indeed did have that duty, and he breached it out of his own self-interest. A jury will determine which view prevails.

## B.  Claims 6, 8 & 10: Fraudulent Concealment, Breach of the Implied Covenant of Good Faith and Fair Dealing, and Unjust Enrichment

King deploys the same four arguments above against the next few claims at issue: fraudulent concealment (claim 6), breach of the implied covenant of good faith and fair dealing (claim 8), and unjust enrichment (claim 10). (*See* ECF 59-1, at 4.) For the same reasons just discussed, those arguments are rejected. We turn then to King's other summary-judgment arguments on these claims.

### 1.  *Fraudulent Concealment*

On the fraudulent-concealment claim, King insists there is an "absence of material facts." (ECF 59-1, at 14.) To succeed on such a claim, plaintiffs must prove: "(1) Deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) That the defendant acted with scienter; (3) An intent to induce plaintiff's reliance upon the concealment; (4) Causation; and (5) Damages resulting from the concealment." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987). For reasons already discussed, a reasonable jury could find that King had "a duty to speak" but deliberately kept K2 in the dark out of self-interest. Thus, King is not entitled to judgment as a matter of law on the first three elements. And plaintiffs could meet their burden of establishing

11

causation and damages by pointing to the more than $660,000 in concessions K2 claims it would not have granted with full knowledge of the facts.

King's only other argument against this claim is that he invoked, and K2 accepted, the sell option *before* Lefebvre attempted to terminate the EAA on June 29, 2020. (*See* ECF 59-1, at 14.) But this was still more than a month before the 2020 Repurchase Agreement was executed on July 31, 2020 (*see* ECF 1-5, at 2), and thus well before King was paid. Critically, negotiations about the final valuation were ongoing. (*See* ECF 79-4, at 4–5.) A reasonable jury could find that King stayed silent to avoid putting the transaction—and his payday—at risk.

## 2. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

King makes no new arguments against the claim of a breach of the implied covenant of good faith and fair dealing, relying on his previous contentions. (*See* ECF 59-1, at 14–15.) His arguments fail for the same reasons. *See Amirsaleh v. Board of Trade of City of New York, Inc.*, No. 2822-CC, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009) (reciting elements of the implied covenant); *Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*, No. 16362NC, 1999 WL 893575, at *10 (Del. Ch. Oct.13, 1999) (discussing the implied covenant's bad-faith requirement).

## 3. *Unjust Enrichment (Against King)*

Plaintiffs do not directly respond to King's arguments for summary judgment on the unjust-enrichment claim. (*See* ECF 79, at 28.) Regardless, plaintiffs fail to establish an essential element of this claim: "the absence of a remedy provided by law." *See Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). Success on any one of their other claims against King could garner them a legal remedy that addresses the identified injury: "overpayment . . . directly attributable to the concealment." (ECF 1, at 30.) The Court therefore grants King summary judgment on the unjust-enrichment claim (claim 10).

## C. Claim 9: Breach of Covenant in the 2020 Repurchase Agreement

According to King, plaintiffs have "not produced a scintilla of evidence to substantiate" their claim that he breached a covenant in the 2020 Repurchase Agreement.

12

(ECF 59-1, at 23.) That agreement states, in relevant part, that for a period of two years, King would not "directly or indirectly" "participate in, assist, aid or advise in any way . . . any business or enterprise that engages in or competes with the business of [High Point] in writing Occupational Accident insurance" or "take any other action that is intended to take away" High Point's business. (ECF 1-5, at 6.)

K2 alleges that King breached this covenant by "participating in, assisting, aiding, or advising the efforts of Lefebvre" and entities connected to him "to take away High Point's occupational accident insurance business under the [EAA] and divert that business to Gallagher." (ECF 1, at 29.) There is much more than a scintilla of evidence to support these allegations. After the signing of the 2020 Repurchase Agreement—while King was still president of High Point—Lefebvre sent King an email stating, "I did call Gallagher *as you suggested* Friday and had an interesting conversation." (ECF 85, at 7 (emphasis added).) Later that day, in a separate email to King, Lefebvre discussed Gallagher's insurance offerings, concluding with: "thanks for the lead." (*Id.*) The next month, Lefebvre forwarded King an agenda for an upcoming meeting with Gallagher and asked if he could call King about it. (*Id.* at 9.) The day after that scheduled meeting, Lefebvre notified High Point that he had authorized Gallagher to review insurance data from "each of [his companies'] programs." (ECF 1-9, at 2.) Shortly thereafter, Gallagher took all of Lefebvre's insurance business away from High Point. (ECF 85, at 5.) Although King and K2 could have objected to these dealings under the EAA, there is no evidence that King ever did so. Nor did King even inform K2's Murray and Risen of the EAA's existence and their right to object. (*See id.* at 5; ECF 79-5, at 4.)

King disputes none of this evidence. Based on this record, a reasonable juror could conclude that King recommended Gallagher as a replacement for High Point, encouraged Lefebvre before his meeting with Gallagher, and assisted Gallagher's takeover of the programs by not objecting or invoking the EAA. Summary judgment on this claim is denied.

### D.   Claims 11 & 12: Usurpation and Breach of Restrictive Covenant

Regarding usurpation (claim 11) and breach of the restrictive covenant (claim 12), plaintiffs concede that "discovery did not produce sufficient evidence to prove these claims at trial." (ECF 79, at 27.) Thus, summary judgment is granted for the defense on them.

**LEFEBVRE'S AND DCN'S SUMMARY-JUDGMENT MOTION,
JOINED BY DEFENDANT TSS**

TSS joins in the joint summary-judgment motion filed by defendants Lefebvre and DCN, which is addressed below. (*See* ECF 52-1 (summary-judgment motion); ECF 63 & 95 (joinder motions).) Notably, that summary-judgment motion does not challenge claim 2 at all, nor claim 1 as to TSS. So, the Court will not consider summary judgment for claims 1 and 2 against TSS.

### A.   Claim 1: Breach of the EAA (Against Lefebvre)

Lefebvre moves for summary judgment on the claim that he breached the Exclusive Agency Agreement, because he cannot be held personally liable for breaches of his company's contracts. (ECF 52-1, at 18–21.) That is, Lefebvre signed the EAA as TSS's president, not in his individual capacity. (ECF 52-3, at 6.) Plaintiffs have not opposed this motion. There is no dispute that New York law governs the EAA. (*See* ECF 1-6, at 6.)

"A member of a limited liability company may not be held personally liable on contracts entered into by his or her company, provided he or she did not purport to bind himself or herself individually under such contracts." *Panasuk v. Viola Park Realty, LLC*, 839 N.Y.S.2d 520, 522 (App. Div. 2007). To pierce the corporate veil and hold an LLC member liable for a company obligation, a plaintiff "has the burden to establish" that the member "exercised complete domination" of the firm and "abused the privilege of doing business in the corporate form to perpetrate a wrong." *DePetris v. Traina*, 181 N.Y.S.3d 298, 300 (App. Div. 2022). Factors indicating such an abuse include "failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use." *East Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 884 N.Y.S.2d 94, 99 (App. Div. 2009). Ordinarily, the "inference of abuse

14

does not arise" when a corporate entity "was formed for legal purposes or is engaged in legitimate business." *TNS Holdings, Inc. v. MKI Sec. Corp.*, 703 N.E.2d 749, 751 (N.Y. 1998).

Lefebvre avers that he "always abided by all appropriate legal and financial formalities in his dealings with [TSS]"; "TSS was fully capitalized" at all relevant times; he "never intermingled [his] personal finances with those of TSS"; he "was never called on to personally guarantee any loans made to TSS"; and at all times "TSS maintained accurate and comprehensive books and records." (ECF 52-3, at 3.) Plaintiffs adduce no evidence to contradict these sworn statements. They have failed to meet their burden.

Accordingly, summary judgment is granted for Lefebvre as to the claim for breach of the EAA. And the Court need not address Lefebvre's other arguments for summary judgment. (*See* ECF 52-1, at 21, 25.)

## B. Claim 3: Tortious Interference with the EAA (Against Lefebvre and DCN)

As a preliminary matter, the parties seem unsure about which jurisdiction's laws apply to the tortious-interference claim. (*See id.* at 22 (discussing two states' laws); ECF 80, at 13 (committing to none).) The EAA specifies that it is "governed by" New York law. (ECF 1-6, at 6.) But jurisdictions are not uniform on the issue of "whether contractual choice-of-law clauses govern torts that later arise related to the contractual relationship." *See Panthera Rail Car LLC v. Kasgro Rail Corp.*, 985 F. Supp. 2d 677, 691 (W.D. Pa. 2013). In California, however, when a contract provision uses the "phrase 'governed by,'" it "encompasses all causes of action arising from or related to that agreement . . . including tortious breaches of duties emanating from the agreement or the legal relationships it creates." *Nedlloyd Lines B.V. v. Superior Ct.*, 834 P.2d 1148, 1154–55 (Cal. 1992). Tortious interference with the EAA would thus fall within the scope of that agreement's choice-of-law provision, at least in this forum.

Applying California's choice-of-law rules, the Court finds that "the chosen state has a substantial relationship to the parties," since TSS is a New York LLC. *See First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015). And New York's laws

15

of tortious interference are not contrary to any fundamental California policy—in fact, the tort's five elements are virtually identical in both states. *Compare Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 459 n.5 (Cal. 1994) (California elements) *with Lama Holding Co. v. Smith Barney Inc.,* 668 N.E.2d 1370, 1375 (N.Y. 1996) (New York elements). The Court will thus apply New York law here.

### 1. *Lefebvre*

Lefebvre argues that he cannot be liable for tortiously interfering with the EAA because he "was not a 'stranger' to the EAA and therefore could not, legally, have interfered with it." (ECF 52-1, at 23.) Plaintiffs concede that "this argument might have merit as to Lefebvre's liability," and indeed it does. (*See* ECF 80, at 13.) "[O]nly a stranger to a contract, such as a third party, can be liable for tortious interference with" it. *Ashby v. ALM Media, LLC*, 973 N.Y.S.2d 109, 110 (App. Div. 2013). Lefebvre was the owner and president of TSS, which is one of the two parties to the EAA. (*See* ECF 52-3, at 3; ECF 1-6, at 9.) Generally, a corporate officer "is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken." *Courageous Syndicate, Inc. v. People-to-People Sports Comm., Inc.*, 529 N.Y.S.2d 520, 521 (App. Div. 1988) (cleaned up). So, Lefebvre is entitled to summary judgment on the tortious-interference claim.

### 2. *DCN*

Summary judgment is also appropriate for DCN, but for a different reason: the scant evidence of causation. Among other elements, tortious interference with contract requires "defendant's intentional procurement of the third-party's breach of the contract without justification." *Lama Holding Co.*, 668 N.E.2d at 1375. Proof that the breach would not have occurred "but for the activities of the defendant" is "essential." *Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., Inc.*, 749 N.Y.S.2d 249, 249 (App. Div. 2002). DCN correctly argues that plaintiffs "will not be able to prove it took any action, improper or otherwise, designed to induce TSS to breach the EAA." (ECF 52-1, at 24.)

Plaintiffs' theory of interference is that DCN "procured TSS's breach . . . by replacing High Point with Gallagher while the [EAA] was in effect." (ECF 1, at 20.) "Lefebvre then began using DCN instead of TSS to transact . . . business with Gallagher, in an attempt to evade TSS's contractual obligations to High Point." (*Id.*) "As a result of . . . DCN's wrongful actions, TSS breached the [EAA] by . . . withdrawing all business from High Point while the agreement was still in effect." (*Id.*)

There are some daunting problems with this theory. At the outset, plaintiffs do "not allege that DCN is bound by the terms of the [EAA]." (ECF 52-11, at 8.) And there is no evidence that the DCN board's decision to change insurance providers (*see* ECF 52-8, at 1) had any effect on EAA-signatory TSS's independent decision to do so as well. DCN's move affected only its own shareholder clients. Finally, there is no evidence that DCN's switch impacted TSS's ability to fulfill its own obligations under the EAA. Put another way, nothing about DCN's "replac[ement] of High Point with Gallagher" (ECF 1, at 20) prevented TSS from honoring the EAA and continuing to do business with High Point on behalf of its own clients. Evidence supporting the "essential" element of "but for" causation is entirely lacking. *Cantor Fitzgerald*, 749 N.Y.S.2d at 249.

In their opposition, plaintiffs rejoin that DCN may be "liable for tortiously interfering with the EAA for its involvement in convincing truck drivers to leave TSS and join DCN." (ECF 80, at 13.) But the complaint accuses TSS of violating the contract by moving its insurance business to *Gallagher*, not moving its clients to DCN. (*See* ECF 1, at 18.) So, this argument lacks any connection to the pleaded theory of contractual breach.

In other words, plaintiffs' argument seems to presume a theory of breach not expressed in the complaint—that the gradual migration of clients from TSS to DCN *itself* breached the EAA. To be clear, that is not the breach plaintiffs pleaded. (*See* ECF 1, at 18.) The complaint does not allege TSS's loss of clients to DCN as a breach—or even mention it—likely because plaintiffs were unaware at the time that such a move had occurred. But after plaintiffs learned of it in discovery, they never amended their pleading to account for that shift. For purposes of this motion, it's now too late. A plaintiff may not "effectively

17

amend [its] Complaint by raising a new theory . . . in response to a motion for summary judgment." *La Asociación de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010). The breach alleged in the complaint involves TSS choosing Gallagher for the client accounts within its control. Any previous "involvement" by DCN "in convincing truck drivers to leave TSS" and become DCN shareholders is irrelevant. (*See* ECF 80, at 13.)

Accordingly, summary judgment is granted to both Lefebvre and DCN as to claim 3.

## C. Claims 5 & 7: Aiding and Abetting Breach of Fiduciary Duty and Aiding and Abetting Fraud (Against Lefebvre, TSS, and DCN)

Lefebvre, TSS, and DCN seek summary judgment due to a lack of evidence on the claims of aiding and abetting a fiduciary breach and aiding and abetting fraud. In response, plaintiffs address only the claims' damages element. (*See* ECF 80, at 14–17.) But as the Court need not even reach damages, plaintiffs argue in vain. When the party who will "bear the burden of proof at trial" "fails to make a showing sufficient to establish the existence of an element essential to that party's case," summary judgment is mandated. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Despite the lack of serious opposition, the Court briefly traces the evidentiary problems here. Both claims require proof of knowledge, either of the breach or the fraud. *See HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 120 (Del. Ch. 1999) (aiding and abetting fiduciary breach requires "knowing participation by the non-fiduciary in that breach"); *Agspring Holdco, LLC v. NGP X US Holdings, L.P.*, No. CV 2019-0567-AGB, 2020 WL 4355555, at *20 (Del. Ch. July 30, 2020) (aiding and abetting fraud requires "knowledge" of and "substantial assistance" in the fraud); *RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) (the scienter for aiders and abettors, in general, is "actual or constructive knowledge that their conduct was legally improper"). Yet plaintiffs provide no evidence that Lefebvre knew King would breach a fiduciary duty if he didn't report up the chain—or that he knew King failed to do so. As defendants point out,

18

1   "no evidence exists that [defendants] knowingly participated in such a breach." (ECF 52-1,

2   at 27.)

3          As for the fraud claim, the evidence is similarly meager. The complaint alleges that

4   Lefebvre sent the fateful "email only to King, knowing that King would not disclose it to

5   K2" and did "not otherwise inform[] K2 of the intention to terminate" the EAA. (ECF 1,

6   at 26.) This remains a conclusory accusation. As defendants point out, plaintiffs "have no

7   evidence . . . that [Lefebvre's] sending an email . . . constitutes 'knowing participation' in

8   a fraud." (ECF 52-1, at 27.) Plaintiffs have not contradicted this assertion. Nor could they.

9   The Court has been shown no evidence that Lefebvre *knew* King planned to conceal the

10  communication, nor any duty for Lefebvre to separately inform K2.

11         The other allegations of aiding and abetting fraud are also wanting. The complaint

12  alleges that Lefebvre participated in the concealment by not informing K2 "before

13  December 2020 of the decision to have Gallagher replace High Point" (ECF 1, at 26), but

14  the undisputed evidence indicates that DCN's board didn't make that decision until March

15  2021 (*see* ECF 52-8, at 1). Finally, plaintiffs claim Lefebvre used DCN, "another business

16  entity controlled by Lefebvre, . . . to contract with Gallagher in an attempt to insulate TSS

17  from liability." (ECF 1, at 26.) This allegation is completely divorced from the tort

18  supposedly being aided—the "fraudulent scheme to conceal" from K2 Lefebvre's

19  attempted EAA termination. (*See id*. at 25.)

20         The aiding-and-abetting cases against TSS and DCN are no better. The lack of

21  evidence against Lefebvre dooms plaintiffs' case against TSS, which was "wholly owned

22  and controlled by Lefebvre," and thus could act only through him. (ECF 52-1, at 8.) As for

23  DCN, defendants maintain that it "had no apparent interest in how or when TSS cancelled

24  the agreement." (*Id*. at 28.) Plaintiffs adduce no evidence of DCN's knowledge or belief

25  that King failed to relay that information to his superiors.

26         Summary judgment is granted to Lefebvre, TSS, and DCN as to claims 5 and 7.

27

28

**D.    Claim 10: Unjust Enrichment (Against Lefebvre, DCN, and TSS)**

Regarding the unjust-enrichment claim, Lefebvre's summary-judgment arguments are weaker than the ones for DCN and TSS.

**1.    *Lefebvre***

Unjust enrichment is the only remaining claim against Lefebvre. At first blush, plaintiffs appear to have a potentially winnable case on it. In Delaware, a "standalone claim for unjust enrichment" requires proof of: "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law." *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 390 (Del. 2023). If a jury determines that King is liable on any of claims 4, 6, or 8, and that K2 overpaid for High Point, a jury could also find the first four elements satisfied. The absence of any remaining legal claim against Lefebvre satisfies the fifth.

Lefebvre's case for summary judgment boils down to two points. First, he suggests that because the other claims against him fail, so does the claim for unjust enrichment. (*See* ECF 52-1, at 29–30.) Not so. If a jury finds that King's conduct was wrongful and resulted in an overpayment by K2 to Lefebvre, he may not keep that windfall. After all, "[r]estitution is permitted even when the defendant retaining the benefit is not a wrongdoer." *Schock v. Nash*, 732 A.2d 217, 232–33 (Del. 1999). A defendant must make restitution of benefits "that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance." *Id.* at 233 (cleaned up).

Second, Lefebvre repeats King's position that K2 can show no "overpayment" damages because "the unambiguous terms" of the 2016 LLC Agreement set the formula for High Point's valuation. (*See* ECF 52-1, at 29–30.) As discussed before, that argument is not the silver bullet defendants wish. K2 produced evidence that it overpaid in other ways—such as with the more than $660,000 in concessions it "would not have agreed" to, if King had been more forthcoming. (*See* ECF 79-4, at 5.) No defendant has contradicted this evidence. Also, during the months when King and K2 were finalizing the valuation figure for High Point, their "course of dealing" may indicate they "did not consider

20

themselves to be automatically and irrevocably tied to" the contract's formula anyway. (ECF 80, at 17.)

### 2. *DCN and TSS*

As for DCN and TSS, plaintiffs do not substantiate how either was unjustly enriched by K2's alleged overpayment for King's and Lefebvre's interests in High Point's Parent Company. Neither was a party to the 2016 LLC Agreement, and neither is alleged to have benefited from the sale. To the extent plaintiffs contend that TSS was unjustly enriched by the lower premiums it enjoyed through Gallagher, plaintiffs have an adequate remedy at law for that injury in their breach-of-contract cause of action against TSS (claim 1). So, an unjust-enrichment recovery is improper. *See Jennings*, 299 A.3d at 390.

Summary judgment on the unjust-enrichment claim is therefore granted for DCN and TSS, but denied as to Lefebvre.

### CRS'S AND CIM'S SUMMARY-JUDGMENT MOTION

Plaintiffs filed a non-opposition to the summary-judgment motion of defendants CRS and CIM. (*See* ECF 51; ECF 91.) Claim 1 accuses CRS of breaching the EAA through defendant Lefebvre, on an alter ego theory. (*See* ECF 1, at 17–18.) Other claims accuse both CRS and CIM of: aiding and abetting King's alleged breach of fiduciary duty (claim 5); aiding and abetting King's alleged fraudulent concealment (claim 7); breaching the implied covenant as to the 2016 LLC Agreement (claim 8); breaching a covenant of the 2020 Repurchase Agreement (claim 9); and liability under an unjust-enrichment theory (claim 10). (*Id.* at 22–30.)

By their non-opposition, plaintiffs concede their inability to show that CRS was the alter ego of TSS. Uncontroverted affidavits attached to the motion establish that since 2015 and 2009, respectively, CRS and CIM have functioned solely as passive holding companies for membership interests in High Point. (*See* ECF 51-1, at 3–4; ECF 51-3, at 4.) Nothing in the record supports an allegation that either CRS or CIM "took any improper action or participated (knowingly or otherwise) in any wrongdoing." (ECF 51-1, at 10.) Because the

undisputed facts demonstrate that neither CRS nor CIM played any active part in the alleged conduct, they are entitled to judgment as a matter of law on all claims against them.

### PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

Plaintiffs seek to exclude certain opinions from defendants' damages expert, Karl J. Schulze. The Court must fulfill a "gatekeeping obligation" to ensure that expert opinions are both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (cleaned up). If the expert does not provide a sufficient factual basis for the opinion, a court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered" and exclude the opinion. *See GE v. Joiner*, 522 U.S. 136, 146 (1997).

Plaintiffs do not challenge Schulze's expert qualifications. Instead, they contest three specific opinions.

### A.   25% Variable Costs

First, plaintiffs challenge Schulze's opinion that their proposed damages figure should be reduced by "25%" to account for "incremental variable costs that would likely be incurred to service [the lost] business." (ECF 55-2, 37.) Schulze contends, in other words, that plaintiffs' proposed damages figure doesn't account for the fact that they may have saved money—such as "staffing costs" or "office space"—by not having to service as many accounts. (*See* ECF 55-4, at 5–6.) Plaintiffs contend that "Schulze admitted he had no facts or data to support" "his proposed 25% reduction for variable operating costs." (ECF 55, at 15.) Schulze agrees, but has never before "seen a lost profits analysis" that failed to consider "operating expenses of some kind." (ECF 55-4, at 7.)

Schulze's selection of the 25% figure for his deduction is disconnected from the data, and constitutes only an uninformed, if educated, guess. Schulze reviewed High Point's income statements from 2013–14, which indicated "non-commission operating

expenses at over 40% of gross revenue." (ECF 55-2, at 9.) Of that 40%, "some" would be "variable expenses." (ECF 55-4, at 5.) But Schulze admits he has no "definitive data" from which he could divine High Point's ratio of fixed to variable costs, let alone the additional costs associated specifically with the lost business. (*Id.* at 8.) Instead, he made an "assumption" that "25% of operating costs would probably be variable costs." (*Id.*) Schulze gives no reason why an assumption of 30% or 5% would be any less reasonable. Because the recommended percentage reduction "is connected to existing data only by the *ipse dixit* of the expert," it must be excluded. *See Joiner*, 522 U.S. at 146.

In defending Schulze's 25% reduction, defendants rely on *Alaska Rent-A-Car, Inc. v. Avis Budget Group*, 738 F.3d 960 (9th Cir. 2013), but that case only proves this Court's point. (*See* ECF 66, at 7.) Unlike here, the *Alaska Rent-A-Car* expert had several data sets from which he could extrapolate information about rental-car profitability. 738 F.3d at 970 (noting that "Avis challenges three aspects" of the expert's "testimony: using Alamo as the comparator, using the national rather than the Alaska market as a baseline, and extrapolating from the Juneau market to the entire Alaska market"). The court held that arguments about shortcomings in those datasets went "to the weight of the testimony and its credibility, not its admissibility." *Id.* By contrast, Schulze admitted that his 25% guess was based on *no* data. He didn't even explain how his experience might have informed the selection of his preferred number. Without more, "the analytical gap between the data and the opinion proffered" is too great. *See Joiner*, 522 U.S. at 146. While Schulze may testify that *some* deduction is required, his 25% estimate is not "based upon sufficient facts or data." *See* Fed. R. Evid. 702(b). Schulze's opinion about the 25% variable-expenses reduction is excluded.

**B.    10% COVID-19 Reduction**

The disconnect is even worse for Schulze's second challenged opinion: that High Point's lost profits should be reduced to account for a slump in trucking business during the COVID-19 pandemic. (*See* ECF 55-2, at 9, 37, 39.) Schulze reasons that "trucking, as many other industries, was severely reduced and restricted" during that period (*Id.* at 9);

Schulze's firm has done "a good deal of work in the trucking industry and they all suffered in 2020" (ECF 55-4, at 11); if "drivers were not driving," Schulze posited that they were "not in need of insurance," and thus High Point's business would have fallen off (*id.*). He "pulled market studies on the trucking industry" for "another matter," yet he did not cite these in his reports. (*Id.* at 11–13.) From all this, Schulze concludes that High Point's alleged lost profits should be reduced by 10%. (*See* ECF 55-2, at 9, 37, 39.)

Plaintiffs point out that Schulze "cites no evidence or data to support the conclusion that TSS lost customers" during the pandemic. (ECF 55, at 16.) Schultze admits that he has "no way of quantifying" any loss. (ECF 55-4, at 11.) He claims to rely on reports about the trucking industry (to which he does not cite), but nothing about the trucking-*insurance* industry—the relevant sector here. Nor does he provide any underlying facts or data to support his assumption that a slump in the trucking industry must necessarily impact insurance profits. As Schulze conceded: "[T]hat was just a general comment that it obviously would have had an impact. I can't measure it." (*Id.* at 13.) Since Schulze offers no facts or data whatsoever to support this opinion, the same "analytical gap" dooms it as well. *See Joiner*, 522 U.S. at 146. The Court excludes any opinion by Schulze that High Point's alleged lost profits should be reduced—by any amount—to account for the effects of the pandemic.

## C.    Best-Practice Profits Model

Finally, plaintiffs quarrel with Schulze's opinion that High Point's own "historical experience" with lost clients is a less relevant indicator of its loss than the actual profits earned by Gallagher, the third party that took over issuing their policies. (*See* ECF 55, at 17–18; ECF 55-2, at 9–10; ECF 55-3, at 5.) Schulze states that for loss calculations such as this, "the best measure . . . is the benefit that that other party realized." (ECF 55-4, at 18.) Plaintiffs complain that "Schulze made no attempt to *quantify*" damages through this alternate method because he "didn't have the data [he] needed" to do that calculation. (ECF 55, at 17–18.) True, Schulze did not offer any alternative numbers. But the burden is not on the defense to suggest a dollar figure for damages—it is the plaintiff who "has the

burden of quantifying the injury at trial." *Silgan Containers, LLC v. National Union Fire Ins. Co.*, 543 F. App'x 635, 636 (9th Cir. 2013). Drawing on his 45 years of constructing profit models as a certified public accountant, Schulze opines that the method plaintiffs used to calculate their loss was suboptimal. In such circumstances, an "expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion." *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).

Thus, Schulze may testify about this last contested opinion. At trial, plaintiffs will have the opportunity to cross-examine Schulze and impeach this theory, if possible. *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and attention to the burden of proof, not exclusion.").

## **CONCLUSION**

Thus, CRS's and CIM's summary-judgment motion is granted, and the other summary-judgment motions are granted in part. The Court grants **SUMMARY JUDGMENT** for:

1.  Defendant King on unjust enrichment (claim 10), usurpation (claim 11), and breach of the Repurchase Agreement's covenant (claim 12).

2.  Defendant Lefebvre on breach of the Exclusive Agency Agreement (claim 1), tortious interference with contract (claim 3), aiding and abetting breach of a fiduciary duty (claim 5), and aiding and abetting fraudulent concealment (claim 7).

3.  Defendant Trucking Support Services, LLC, on aiding and abetting breach of a fiduciary duty (claim 5), aiding and abetting fraudulent concealment (claim 7), and unjust enrichment (claim 10).

4.  Defendant Creative Insurance Managers, Inc., on all claims.

5.  Defendant Contractor Resource Solutions, Inc., on all claims.

6.  Defendant Distribution Cooperative Network of New York, Inc., on all claims.

The motions for summary judgment are otherwise denied.

25

Plaintiffs' motion to exclude expert testimony is **GRANTED IN PART**. The Court excludes Schulze's opinions about the 25% variable-expenses reduction and the pandemic-related reduction.

Dated:  September 30, 2024

_____
Andrew G. Schopler
United States District Judge